The 4th District Federal Court of the State of Illinois has reconvened. The Honorable Amy Chandler-Manner presiding. Good afternoon, you may be seated. Court is taking up People of the State of Illinois v. Carlos Chapman, case number 4-24-1303. Counsel for the appellant, if you could please state your name for the record. Chuck Brett. Counsel for the appellant. Kenneth E. Mondragon, Office of State Security and Countercrime Security. Thank you. Counsel, you may proceed. Thank you. Police and Courts. Your Honors, again, my name is Chuck Brett and I thank you for the opportunity to be heard this afternoon. And to begin with, what we would assert is that there are three main issues here in this case, and I think that when you look at them fairly and review the record, that all three of those issues should be found in favor of the appellant in this case. To begin with, there was no probable cause for the initial stop of the vehicle. And in saying that, I think a review of the record, which at your discretion could include a review of the videotape, will show that the car is going down the highway, the appellant's car is in the inner lane getting ready to pass the semi. There's a car in between the appellant's car and the squad car. And from that vantage point, it's not the easiest thing to see, but you can see that the blinker of the appellant's car turns on well before he moves over into the outside lane after having passed the semi truck. As we've stated in our briefing, at 70 miles an hour, that's a little over 100 feet a second, and so we're well outside the 200 feet that's required by statute. And so for that reason, that reason alone, the stop was flawed from its very inception. Now, in stopping and thinking about this, I always try to look at what the other side, you know, I look at this, and if they can test that you can't see the blinker through the window, I don't think that that resolves their issues. As a matter of fact, I think that that also weighs heavily in favor of the defendant for this reason, that if, in fact, you were to find that you can't tell when the blinker is turned on, when the car that the appellant is in front of the other car, then there's no way that the trooper could have determined also when the blinker was turned on, and there's no way then that he could form a reasonable basis for probable cause to pull the vehicle over, because he can't tell when the blinker was turned on, so he doesn't know if it violated the statute or not. Again, we believe that the evidence is there that shows the blinker was on for six or seven seconds, which would be well in excess of the 200 feet required. But even if you look at it the other way, and there's a finding the other way, I still think that we have established what we need to in order to show that the initial stop itself was flawed. Now, turning from that, I think things continue to go downhill for the state in reference to this case. And it is very clear that the actions of the trooper here are solely designed to effectuate a search of this vehicle, probable cause or not. The actual dialogue that takes place reveals that there is no smell of cannabis detected until the appellant is in the squad car and the smell is on his person. And specifically looking at, which we cited to in page two of our reply brief, cited to the record pages 73 and 74, the trooper is specifically asked about when the appellant is in the passenger seat, he's wearing his driver's license, doing the routine traffic stop. And he said, while he's talking to me, the odor of burnt cannabis emitted from his breath and clothing. And the question was, well, that was detected after he was in your vehicle seated next to you, correct? The answer, yes. And went on to say, and that was the first time that you detected the odor of cannabis. The answer again, yes. So there is no smell of cannabis in the car. Later, there was a statement that he did smell it. And the judge finds that he smelled the odor. The judge at the car. The judge did make a find to that effect, but our contention respectfully is that it's contrary to what the record shows. Because on page 74 of the record, it also, the trooper was questioned as to whether he could smell the shake that he ultimately found, and he indicated he could not. And the other portion that's relevant is that there's nothing ever mentioned about the shake until well, like 20 minutes into the search, where the trooper for the first time mentions, oh, there's some shake on the floor, and used some tape to retrieve it. At no time did he ever mention any time that he had found, that he smelled fresh cannabis. And again, his direct sworn testimony was that the first time that he detected the odor of cannabis was when he smelled it on the person of the appellant, not otherwise. So what we have here is not any smell emitting from the car. What we have here is just smell emitting from the person of the appellant, and some discussion about that he may have smoked on a previous occasion. But we know that that in and of itself, based on Bredman and the other cases, is not going to give them probable cause to go into the car. So what about the shake that he observed on the floor? Well, again, when you look at the video and review the video carefully, never at any time does he indicate he's seen the shake or make any reference to it until well into the search of the vehicle. That's about 20 minutes after he starts searching. And we have a scenario where there is no indication that he's seen it. He doesn't confront the appellant with it in any way. He admits he can't smell it. So even if he saw some littering on the floor, he doesn't know what it is at that point because he can't smell it by his own admission. Well, didn't he justify that he saw it? Because when he first shined his flashlight into the car. I don't believe that that's what the record shows. There was some discussion about seeing cannabis in the car and things of that nature. But in the record it believed that he does not at any time actually acknowledge that he, particularly in the video, acknowledge that he knew the shake was there until after he started the search. And I think that that's what it says. I mean, if he says that. So hypothetically he walks up on his first approach and looks in and sees the shake on the floor. Would that be probable cause? Well, I don't think so at that point because he can't smell anything. So if he sees something that could be some sort of contraband, but he can't smell it. He can't confirm what it is. You've got a car that he later finds out to be a rental car. And as a matter of fact, there was never any verification that it was cannabis at all at any point. And he can't smell it. He later said that that's what it appeared to be to him. But without any saying more, I don't think that that would give him a probable cause. But isn't it the totality of the circumstances? So if he saw the shake on the floor and then he smells the cannabis after they're sitting in the car, taking that together, that's the totality of the circumstances. Wouldn't that be enough to search the car? Even if the court were to adopt that position, I think that then leads to the other two points. And one of them is that the scope of the search was excessive. And we have cited to the Randall case, which cites to the California, Wimberly case from the California Supreme Court, understanding that's instructive binding on this court. But all that it would indicate, if you saw a minor amount of shakes on the floor of the car and there's a smell on the person and an admission that he had smoked at some earlier time, all that's indicating is that he's a user of cannabis, which of course is illegal for him to do in the state of Illinois. And so that in and of itself would not provide, certainly under the logic of Randall, which adopted the logic of Wimberly, would not provide probable cause then to go into the trunk of the car and to do the search that the trooper conducted. The other part of this... Counselor, if I may, the Wimberly case, didn't that predate the United States versus the Ross case, 456 U.S. 798, which suggests that PC to search a vehicle may justify the search of any area that may conceal the object of the search? It may. I think it did. And I believe that it still is the scenario that the probable cause, if it existed, to that there was some casual use, personal use of cannabis by the driver without any further indication that there was something in the trunk should be limited to a search of the passenger compartment only. And again, contrary to anything that the trooper said otherwise, if you watch the video, it is well into the search of the car that he first mentions the shake. So if he had actually seen it before, that's what actually occurred, then there would be no reason in the midst of him questioning the appellant and going through all the machinations that he did to keep him there that he would not have brought that up in reference to questioning him and exploring what facts that he was working with at that point. So beyond that, we have the fact that the stop was clearly, clearly prolonged. I was curious about coming from Mississippi, but he's on I-80, but he's going to Joliet. And I think there's a reference to that. And it's an out-of-state plate. And he doesn't have the rental agreement. If I'm the trooper, I've got some antenna going up just based on those facts. Well, there was not a discussion of what the route was, whether he had any other stops along the way, that sort of thing. He could have went through different parts of the country to get there. But here's the problem with the whole thing that the record shows in reference to the rental agreement. When they get back there, it appears that what they grabbed was a rental agreement that had been left in the glove box of the car from some earlier renter. On at least three, and I think it may have even been four different occasions, the appellant is saying, well, let's just go get the other one out of the glove box. And the trooper keeps saying, no, no, no, that's okay, you don't need to do that. He says, I will go get it. But he never did. But if I'm the trooper, am I going to let him go back to the car and get it in the glove box? Well, he certainly could have escorted him back to the car to get it. And if that was really what it was all about, part of the issue, though, is that what we found out when the trooper, I mean, it was actually 22 minutes into the stop before they actually start the search. And as to the issue of the long stop, the trooper was asked, is it fair to say that the 15 to 20 minutes you were looking up the statute and he, meaning the appellant, was calling his family, it was just a ruse to buy time for backup to come so you could search the vehicle? And his answer under oath was yes. So he wasn't really interested in finding out whether there was a current rental agreement in there. There was no indication the car was stolen. There was no indication that anything was amiss in that regard. All he was trying to do, he made up his mind that he was going to search the car no matter what, and he was stalling in order for backup to get there, in order to be able to have someone watch the appellant while he was conducting the search. And so on that basis where you cannot use the rental agreement because we never learned whether there was actually a rental agreement in there or not, but again, based on the fact there was no report the car was stolen, there's no issue with him driving the car, he's got a valid license, there's no reason not to do anything other than to write him a citation and send him on his way. So the issue that I think it comes back to is, number one, there's a three-pronged problem with this case as a whole. The first one is the probable cause for the stop itself, and I would encourage you to look at that. Obviously, if there's no probable cause to pull it over, everything that flows thereafter is through the poison stream. Secondly, if you look at the video, you will see that it is well into the stop when the trooper for the first time mentions seeing the shake and does, with some tape he gets a portion of it and that sort of thing. Beyond that, all he has is some smell on the person himself, which he never searches the gentleman, and an admission that at some previous time that he'd smoked, which other cases were found to be insufficient. And then finally, we have the issue of the fact that, I applaud the trooper for his candor, that he admitted that this was all a ruse. I mean, he even admitted to the word ruse, that he'd be keeping him there so that I could get some backup so I could search the car. And under those collective circumstances, we are asking that the court find in favor of the appellate. Does he ask for backup fairly quickly, though? I don't remember the exact timing of that. But whether he does or he doesn't, I mean, obviously he's only allowed to keep him there as long as he needs to effectuate the purpose of the stop itself. And even if he has subjectively in his mind that he wants to keep him there longer so he can get backup so he can do a search, without the probable cause to do that, then it'd still be inappropriate. If you'd address for me, counsel, was the argument that the search was unduly prolonged argued at the trial court level? I don't know that it was argued in those specific words. Certainly the unconstitutionality of the stop and the lack of probable cause was. I think that a component of those issues is the prolonging of the stop. I think that the issue was fairly enough put before the trial court that this court should consider it. And it doesn't surprise me that the state would like for you to find that that issue was forfeited or waived because the fact that the evidence is so squarely against them in that regard. But in the event that this court were to find that it was not sufficiently raised so that it would potentially be forfeited, we would obviously, as we set forth our briefing, ask the court to look at this in a plain error sort of analysis. Because of the fact, when you have, like you said, when you have the trooper under oath admitting that this prolonging of the stop was all a ruse just to eventually effectuate a search, I think that that is, and that was part of the evidence during the trial. So whether it was specifically argued in that regard or not, it certainly was brought up in the evidentiary portion of the hearing. And I think that the issue, this court should find the issue was sufficiently preserved. All right. If you have no other questions, then I will wrap it up. Thank you. Thank you. Counsel, you may proceed with argument. Good afternoon, your honors. May I please the court, counsel? It's good to be back in the courtroom. I think this is the first time in six years. Yeah, since 2019. So glad to make use of the building again. He's referring to COVID, not his own inactivity. Okay. That's probably a fair explanation. And obviously I'm Tim Rodriguez from the prosecutor's office. And it appears to me that the main bone of contention in this appeals is the interpretation of the record. I understand that the defendant wishes to interpret the record in a manner most favorable to himself. Not surprising. But I think that the record is fairly clear that this officer did testify that there was an odor of raw cannabis emanating from the vehicle. And that he noticed this upon his initial approach to the vehicle. First, let me address on page 74 of the record the initial conversation between the trooper and defense counsel, who has filed the motion and went first. He was asking what he noticed when he brought the defendant to his vehicle. And the trooper responds that the odor of burnt cannabis emitted from his breath and clothing. And so this was repeated. So the odor of burnt cannabis was on his breath, and yes, it was. When was the first time you detected the odor of cannabis, then, was the subsequent follow-up question by defense counsel. Well, I think the trooper was naturally assuming that defense counsel was referring to the burnt cannabis, which was just testified to one line above. So he says, the first time, he said, when was the first time that you detected, and that was the first time that you detected the odor of cannabis. And he says, yes, I think he was referring to burnt cannabis. If you look at the very next few questions and answers, he says, that was when he was seated next to you. He says, yes, I couldn't smell the shake. It's just visible. He didn't say when he couldn't smell the shake when he was sitting, when he was discussing this particular period of time. And then again, counsel asked him, prior to sitting next to you, you didn't have any detection of any other cannabis. Correct the smell or detection of any other cannabis. And he says, no. Well, again, he's referring, I believe, to burnt cannabis. And he's incorrect, because in his own testimony, he's already admitted, or testified rather, that he discovered the shake upon immediately approaching the vehicle. And this was clarified when the state had its opportunity to examine the trooper. The first question on page, bottom of page 74, top of page 85, counsel says to the trooper, the state being the counsel, upon your initial approach, did you make any observations at that point in time? Yes, is the answer. The cannabis shake, passenger side floorboard. Question, and did you notice, and you indicated earlier, you noticed the odor of raw cannabis? This is the first mention of raw cannabis. Answer, yes. And between the raw and burnt, are you able to differentiate between those two smells? Counsel then gets into the officer's qualifications to differentiate between raw and burnt, and an explanation as to why that is important, because in transferring raw cannabis, you have to do so in an odor-proof container, and when you can detect the odor of raw cannabis, you can assume that the cannabis is being improperly transported, and therefore it's a violation of the law. And according to Molina, who reaffirms Hill, the odor of raw cannabis is sufficient in and of itself to justify a reasonable cause for the search of the vehicle. So we have the officer very clearly saying, again, in the middle of page 85, based on your training and experience, what does the odor of raw cannabis emanating from a vehicle mean to you, that there's raw cannabis in the vehicle? You should not be able to detect the odor of raw cannabis. And then again on page 90, the officer states, Ann Trooper Davidson, is it accurate to state that you're searching for cannabis after smelling the raw cannabis and observing the shake as well? Answer, yes. 96 of the record. Is it illegal to possess cannabis in the trunk while you're driving your car? Yes, you can't be able to smell it. It's your testimony, though, that the smell of it would make it illegal and that's what gave you probable cause. Answer, yes. Then, of course, the court agrees with the state's position here on appeal. It specifically found, one of the three reasons it specifically identified, for having found probable cause for this search, was the odor of cannabis emanating from the vehicle. Now, the judge was not specific. He did not say the odor of burnt cannabis or the odor of raw cannabis, but he did say the odor of cannabis emanating from the vehicle. And there was no testimony that there was an odor of burnt cannabis emanating from the vehicle. The only testimony concerning the odor of burnt cannabis was when the defendant himself was in the trooper's squad car. And that's that discussion, and I think that's on page 74. So I believe there's sufficient evidence here, as the trial court found, that there's, one, the discrepancy of shake when the officer approaches the vehicle. Two, the odor of raw cannabis emanating from the vehicle. Three, the odor of burnt cannabis emanating from the defendant while the defendant is seated in the trooper's squad car. And four, the defendant's admission that he had smoked cannabis at some earlier point in time. So based on those four criteria, the judge found probable cause to search the trunk, and I think that's appropriate and supported by the record. In addition, the defendant makes an argument that there was insufficient evidence to stop this vehicle in the first instance. Again, to take exception to that, I think that the trooper was clear in his reasons, and the reasons were twofold. In addition to the lack of a signal sufficient to justify the move from one lane to the other, he also testified that the defendant cut the semi off. So he was testifying that he, the defendant, pulled too quickly from the left lane into the right lane, too close to the semi, which was prohibited by Illinois law. He called that, the trooper, following too closely, but there is no statute necessarily, at least I didn't try one, that said following too closely. I think what the trooper was intending to reference was 625.5-11703, overtaking the vehicle on the left. That statute says that having passed the vehicle on the left lane, a driver shall not move back into the right side of the roadway until safety clear of the overtaken vehicle. So that leaves a little, I guess, room for interpretation as to what a safe distance is. Counsel for the state asked the trooper what he thought a safe distance was. He said 300 feet. She asked him if he was referencing a NHTSA standard or guideline, and he said he was. So that's the National Highway Transportation Safety Administration. So apparently there is no particular statute that gives a designation, but that's what the trooper was relying upon in making his estimate that the movement of the defendant's vehicle was in violation of the statute 703. In addition to the lack of a signal, opposing counsel suggests that the officer was not in a position to observe the signal or the length at which the signal was given. However, he's equating the view from the squad car to be identical to the same view that the trooper had driving his vehicle. I would suggest there's no evidence of that. In fact, I think the trial court maybe even made a passing reference to the fact that the trooper's view could have been significantly different from that of the camera in his vehicle. So regardless, I think either the lack of a proper signal or the lack of appropriate distance, either of those gives the officer sufficient cause to pull the vehicle over. As opposed to or on the issue rather of whether the stop was prolonged or whether the search was beyond the limits required, I think both of those issues are weighted. Neither of those issues was argued before the trial court. The state was not given the opportunity to explain in detail what the officer was doing or what the officer was thinking. If the defendant wished to raise that issue, he had the opportunity to do so at that time. He could have inquired of the officer concerning that particular issue. He did not. The state did make a passing comment. I think it includes the argument that the stop was not prolonged. But that does not excuse the defendant's failure to raise this issue and failure to give the state notice that it intended to use this issue as justification for its motion to suppress. So had the defendant done so, I think the state would have more carefully developed a record with regard to this matter. The simple fact that we have a videotape does not excuse or permit the defendant to go forward in the absence of the state's ability to inquire as to this trooper and any other trooper that may have been available to justify the length of the stop or the extent of the search. So if you have no further questions. Seeing none. Thank you, Your Honor. Any questions of counsel? Rebuttal of counsel? If it pleases the court, I would ask to take note that as part of the state's argument here, they ask you not as to one issue but as to two issues that you should start trying to speculate as to what the trooper was thinking. And I don't think that's what the standard of review is. We need to start speculating as to what somebody meant. So that when he, and they want you to speculate that when he specifically says, when he's asked specifically, and seated next to me in the car, I smelled bird cancer, and that was the first time he detected the odor of cannabis. That's a pretty straightforward question. And his answer is yes. But what the state wants to do is somehow speculate that the trooper is confused and he didn't understand. There's nothing confusing about that. It's very, very clear. And if you carefully look at the record that they're talking about in reference to the 85 and 86 of the record, the trooper is giving answers to hypothetical questions in reference to the general manner that the odor of raw cannabis emits from a vehicle, means that a driver could be in possession of cannabis. There's never, as I read the record, a clear indication that he smelled raw cannabis before searching the vehicle. And in reference to the, he specifically said that he did not smell the shake, and what he actually testified is that it wasn't until that he secured the shake from the passenger floorboard, which happened at the 5810 mark in the DASCAM video, 25 minutes after the search began, that he, at that point, I think, formulated an opinion that this was cannabis. Because at that point, he hadn't smelled anything. We're looking at page 85 of the transcript, and question, yes, the cannabis shake, passenger side, floorboard. I'm sorry, that was the answer. Question, and did you notice, and he indicated earlier, you noticed the odor of raw cannabis? Yes. So, he indicates there that he had the odor of raw cannabis when he approached the car. That's contrary to what you just argued before us. Well, my understanding, and if I'm wrong in my recollection, I apologize to the court, but my understanding is he was asking that in more of a hypothetical sense. If that's not what the record shows, obviously, then I stand corrected. But it certainly is contrary to the fact that he had just testified that the first time he detected the odor of cannabis was when he smelled it on the, probably when he was sitting next to him, and a review of the videotape itself shows that he never mentions anything about the shake until the 5810 mark when they're well, well into the search. And so that's how I read that. In reference to the stop of the vehicle here, again, the state is asking you to speculate as to what they think the trooper meant. The bottom line is that if you look at the video, the appellate doesn't cut the semi off. There's nothing unsafe about the way that he changed his lanes in reference to his positioning with the semi. And there is no Illinois statute on point. There's nothing that he did there that was illegal. They didn't argue the breaker scenario, so I assume they're conceding that. But the bottom line is that there was nothing improper about the way that he signaled. There was nothing improper about the way he changed lanes. There was nothing that in any way impeded or caused an unsafe situation regarding to the semi. And so, again, the stop, the initial stop itself was favorably flawed right from the very beginning. In reference then to the prolonging of the stop, again, we believe that it was. The state acknowledged that that issue of prolonging was even brought up by the state in the record. So, obviously, if the state wouldn't have felt it was an issue, they wouldn't have mentioned it. So they were acknowledging, at least in their minds, that it was an issue. And so I think this court should take notice of that. Also, based on the fact that you have clear testimony from the trooper that the stop was, in fact, the prolonging of the stop was a ruse in order to effectuate a search. I mean, that's about as egregious as you can get. There was a 22-minute gap there, obviously well in excess of what it should have been. And so we believe that the court should find that that issue should be addressed by this court on its merits. Thank you, counsel. I believe your time has expired. Thank you so much. Thank you for your time this afternoon, counsel. The court will take the matter under advisement and the court stands at recess.